Thomas N. McCormick (CA Bar No. 325537)
tnmccormick@vorys.com
**VORYS, SATER, SEYMOUR AND PEASE LLP**
52 East Gay Street, P.O. Box 1008
Columbus, OH 43216-1008
Telephone: (614) 464-6433
Fax: (614) 719-6350

*Attorneys for Plaintiffs and Putative Class*

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| Sean Colvin, Everett Stephens, Ryan Lally, Susann Davis, and Hope Marchionda *on behalf of themselves and all others similarly situated*, | Case No. |
| *Plaintiffs,* | **CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** |
| *v.* | 1) VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) |
| | 2) VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) |
| Valve Corporation, CD Projekt S.A., CD Projekt, Inc., Ubisoft Entertainment S.A., Ubisoft, Inc., Ubisoft L.A., Inc., kChamp Games, Inc., Rust, LLC, and Devolver Digital, Inc. | **DEMAND FOR JURY TRIAL** |
| | Judge |
| *Defendants.* | Magistrate Judge |

## INTRODUCTION

1.     Valve Corporation's Steam platform is the dominant platform for game developers to distribute and sell PC games in the United States.

2.     But the Steam platform does not maintain its dominance through better pricing than by rival platforms.

3.     Instead, Valve abuses the Steam platform's market power by requiring game developers to enter into a "Most Favored Nations" provision contained in the Steam Distribution Agreement whereby the game developers agree that the price of a PC game on the Steam platform will be the same price the game developers sell their PC games on other platforms.

4.      Because of this Most Favored Nations provision, or "MFN," other platforms are unable to compete on price, thereby insulating the Steam platform from competition.  The MFN has the effect of keeping prices to consumers high, as price competition by platforms would cause the prices of PC games sold to consumers to decrease.  The MFN also hinders innovation and suppresses output, as it acts as an artificial barrier to entry by potential rival platforms and as higher prices lead to less sales of PC Games.

5.      During the pandemic, PC game purchases and usage have exploded, as more and more Americans are spending more and more time at home.  According to Valve:

> While Steam was already seeing significant growth in 2020 before COVID-19 lockdowns, video game playtime surged when people started staying home, dramatically increasing the number of customers buying and playing games . . . . This has led to new highs for monthly active users (120.4 million), daily active users (62.6 million), peak concurrent users (24.8 million), first-time purchasers (2.6 million per month), hours of playtime (31.3 billion hours), and the number of games purchased (21.4% increase over 2019).[1]

6.      This court should stop the Steam platform's abuse of its market power, prevent game developers from entering into MFNs with Valve, and order that the Class recover treble damages.

## DEFINITIONS

7.      For purposes of this Complaint, the following definitions apply.

8.      A "MFN" is a "Most Favored Nation" provision in a contract.  An MFN is an agreement between platforms and sellers about the prices that sellers will charge buyers who purchase through rival platforms.

9.      A "PC game" is a type of computer game played on a personal computer as opposed to a video game console or mobile device.

---

[1] https://store.steampowered.com/news/group/4145017/view/2961646623386540826 (last accessed Jan. 20, 2021).

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

10.     A "platform" facilitates economic transactions between parties and is a means by which game developers sell their PC games to consumers.   Game developers market their PC games on platforms and set the price of those games.   A consumer purchasing a PC game pays the platform for the privilege of downloading/playing a game, and the platform remits those proceeds, minus a commission, to the game developer.   Steam is a platform owned by Valve.

11.     A "game developer" develops, markets, and/or sells PC games to consumers.   The dominant way consumers purchase games is via platforms— specifically, the Steam platform.

## PARTIES

12.     Plaintiff Sean Colvin is a resident of Carlsbad, California.   Mr. Colvin regularly purchases PC games from Defendants on the Steam platform.   Accordingly, Mr. Colvin has been forced to pay supracompetitive prices for those PC games because of the Steam MFN (as defined below).

13.     Plaintiff Everett Stephens is a resident of Cincinnati, Ohio.   Mr. Stephens regularly purchases PC games from Defendants on the Steam platform.   Accordingly, Mr. Stephens has been forced to pay supracompetitive prices for those PC games because of the Steam MFN.

14.     Plaintiff Ryan Lally is a resident of San Diego, California.   Mr. Lally has purchased PC games from Defendants on the Steam platform.   Accordingly, Mr. Lally has been forced to pay supracompetitive prices for those PC games because of the Steam MFN.

15.     Plaintiff Susann Davis is a resident of Bowling Green, Kentucky.   Ms. Davis has not agreed to the Steam Subscriber Agreement.   Ms. Davis purchases PC games from Defendants on the Steam platform for her minor child, who has his own Steam account.   Accordingly, Ms. Davis has been forced to pay supracompetitive prices for those PC games because of the Steam MFN.

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

16.     Plaintiff Hope Marchionda is a resident of Bowling Green, Kentucky. Ms. Marchionda has not agreed to the Steam Subscriber Agreement.  Ms. Marchionda purchases PC games from Defendants on the Steam platform for her minor child, who has his own Steam account.  Accordingly, Ms. Marchionda has been forced to pay supracompetitive prices for those PC games because of the Steam MFN.

17.     Defendant Valve operates a platform for game developers to sell PC games to consumers called "Steam."  Valve has its principal place of business in Bellevue, Washington.  It is estimated that the Steam platform has a 75% share of the relevant market, as defined herein.

18.     Valve, via the Steam platform, has market power in the relevant market.

19.     Defendant CD Projekt S.A. is a Polish game developer and sells PC games through the Steam platform.  Upon information and belief, CD Projekt S.A. has agreed with the Steam platform to the Steam MFN.  CD Projekt S.A. has its principal place of business in Warsaw, Poland.

20.     Defendant CD Projekt, Inc., a subsidiary of CD Projekt S.A., is a game developer and sells PC games through the Steam platform.  Upon information and belief, CD Projekt, Inc., has agreed with the Steam platform to the Steam MFN.  CD Projekt, Inc., is a Delaware corporation and has its principal place of business in Venice, California.

21.     Defendant Ubisoft Entertainment S.A. is a French game developer and sells PC games through the Steam platform.  Upon information and belief, Ubisoft Entertainment S.A. has agreed with the Steam platform to the Steam MFN.  Ubisoft Entertainment S.A. has its principal place of business in Montreuil, France.

22.     Defendant Ubisoft, Inc., a subsidiary of Ubisoft Entertainment S.A., is a game developer and sells PC games through the Steam platform.  Upon information and belief, Ubisoft, Inc., has agreed with the Steam platform to the Steam MFN. Ubisoft, Inc., is a California corporation and has its principal place of business in San Francisco, California.

23.     Defendant Ubisoft L.A., Inc., a subsidiary of Ubisoft Entertainment S.A., is a game developer and sells PC games through the Steam platform. Upon information and belief, Ubisoft L.A., Inc. has agreed with the Steam platform to the Steam MFN. Ubisoft L.A., Inc., is a California corporation and has its principal place of business in Culver City, California.

24.     Defendant kChamp Games, Inc., is a game developer and sells PC games through the Steam platform. Upon information and belief, kChamp Games, Inc., has agreed with the Steam platform to the Steam MFN. kChamp Games, Inc., has its principal place of business in Vista, California.

25.     Defendant Rust, LLC, is a game developer and sells PC games through the Steam platform. Upon information and belief, Rust, LLC, has agreed with the Steam platform to the Steam MFN. Rust, LLC has its principal place of business in Glendale, California.

26.     Defendant Devolver Digital, Inc., is a game developer and sells PC games through the Steam platform. Upon information and belief, Devolver Digital, Inc., has agreed with the Steam platform to the Steam MFN. Devolver Digital, Inc., has its principal place of business in Austin, Texas.

27.     Collectively, the Defendants identified in paragraphs 19 through 26 are the "game developer Defendants."

## JURISDICTION AND VENUE

28.     The United States District Court for the Central District of California has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)).

29.     Venue is proper in the United States District Court for the Central District of California because Defendants reside in, are found in, have agents in, and transact

CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

business in the Central District of California as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 & 22).

30. Venue is likewise proper in the United States District Court for the Central District of California because Defendant CD Projekt S.A and Defendant Ubisoft Entertainment S.A, including its subsidiaries, have consented to being sued in this District.

31. The United States District Court for the Central District of California has personal jurisdiction over Defendants because, inter alia, they: (a) transacted business throughout the United States, including in the Central District of California; (b) had substantial contacts with the United States, including in the Central District of California; and/or (c) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in the Central District of California.

## ANTITRUST LAWS PROTECT COMPETITION

32. Antitrust laws in the United States generally proscribe certain mergers, acquisitions, and business practices, leaving it up to regulatory agencies and courts to apply the general laws to ever-changing markets and business relationships.

33. Although application of antitrust laws by regulatory agencies and courts depends on the facts and circumstances of each case, the antitrust laws all have the same basic objective: "to protect the process of competition for the benefit of consumers, making sure there are strong incentives for businesses to operate efficiently, keep prices down, and keep quality up." *The Antitrust Laws*, Federal Trade Commission, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/antitrust-laws (last accessed January 20, 2021).

34. The Sherman Act was passed in 1890 as the first antitrust law in the United States. It had as its goal to be a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *Northern*

-6-

*Pacific R. Co. v. United States*, 356 U.S. 1, 4 (1958).  "[T]he policy unequivocally laid down by the Act is competition."  *Id*.

35.   To that end, Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies, that unreasonably restrain competition, and is focused on concerted activity between two or more firms.

36.   Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."

37.   At its core, Section 2 of the Sherman Act makes it illegal to acquire or maintain monopoly power through improper means.

38.   This case involves both agreements between firms that unreasonably restrain competition, as well as single-firm conduct that represents an unlawful use of market power and monopolistic conduct.

## THE ECONOMICS OF MFNS

39.   MFNs instituted by companies with market power are concerning from an economic perspective for multiple reasons.  Steven C. Salop & Fiona Scott Morton, *Cover Story, Developing an Administrable MFN Enforcement Policy*, 27 Antitrust ABA 15, 18 (Spring 2013).

40.   Platform MFNs can harm competition by "keeping prices high and discouraging the entry of new platform rivals."  Jonathan A. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 Yale L.J. 2176, 2201 (May 2018) ("Baker I").

41.   Platform MFNs guarantee that other platforms cannot charge a "lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitors' prices to be no lower."  Baker I at 2178.

42.    MFNs disincentivize sellers from offering low prices, because discounts must be offered to all buyers.  Baker I at 2179.

43.    MFNs create artificial barriers to market entry:

"[S]uppose an entrant wishes to gain customers by charging a lower price (perhaps because it has no established brand name or installed base).  It can profitably sell at a low price by undertaking selective contracting with suppliers willing to offer a discount in exchange for more volume or other favorable terms.  If those suppliers also supply the incumbent, however, an MFN imposed by the incumbent would require the supplier to charge the same price to the entrant.  This parity undermines the entrant's business model by preventing it from making an attractive offer to customers.  The symmetry that MFNs impose on the marketplace thus can prevent new competition that would lower prices."

Baker I at 2180.

44.    Platform MFNs, such as the Steam MFN (discussed below), prevent "outbreaks of competition" because they require each seller (e.g., game developers) selling on the Steam platform to "set the same price on a rival's or entrant's platform. This parity may undermine the discount . . . business model by preventing it from making attractive offers to" both game developers and consumers.  Baker I at 2181–82.

45.    When a platform imposes an MFN prohibiting lower prices on other platforms, it "serves to suppress competition on the crucial dimension of price[,]" and keeps new entrants from undercutting the dominant platform's commission, and, but for the MFN, driving consumers to the rival platform.  Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 Competition Policy Int'l 86 (Jan. 30, 2015).

46.    "Platform MFNs with greater scope and duration would be expected to have stronger anticompetitive effects."  Because of the vast number of game developers selling on the Steam platform and subject to the Steam MFN, discount platforms are unable to complete.  Game developers are unwilling to price at a lower level, because they must do so across all platforms.  Baker I at 2182.

47.    Economic modeling demonstrates that when a dominant platform requires its sellers to agree to an MFN, there are (a) higher platform fees; (b) higher retail prices; and (c) firms with lower-cost models are discouraged from entry.  Andre Boik & Kenneth S. Courts, *The Effects of Platform Most-Favored Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105, 113–29 (Feb. 2016).

48.    As shown in the Boik & Courts model, a lower price entrant (such as Discord, discussed below) cannot successfully enter because the platform's MFN does not allow the entrant to lower prices to attract both sellers and consumers.  *See also, e.g.*, Ameila Fletcher & Morten Hviid, *Broad Retail Price MFN Clauses: Are They RPM "At Its Worst"?*, 81 Antitrust L.J. 1, 74 (2016) ("MFNs can restrict entry at the retail level.  Specifically, they can disadvantage potential retail competitors with low-end business models by eliminating such an entrant's ability to win customers away from the incumbent by offering lower prices and earning a smaller margin.").

49.    Additionally, MFNs "tend to raise industry prices" because they "kill a retailer's incentives to compete in the terms of trade that it offers suppliers.  The reason is that a retailer who raises the commission it charges . . . knows that the price set through its store will not increase relative to that at other stores. . . . This means that suppliers cannot asymmetrically adjust their prices to divert demand towards retailers offering more attractive contractual terms."  Justin P. Johnson, *The Agency Model and MFN Clauses*, The Review of Economic Studies, 1153-54 (Jan. 2017).

50.    MFNs thus "harm competition by assisting an incumbent in foreclosing the entry or expansion of rivals."  Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of Most-Favored-Nation Provisions*, 27 Antitrust No. 2, 24 (Spring 2013) ("Baker II").

51.    MFNs harm competition "by making it impossible for a dominant incumbent firm's rivals, including entrants, to bargain . . . for a low price."  Baker II at 24.

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

52.     Indeed, real world examples show that, when platform MFNs are banned, prices to consumers fall.  Andrea Mantovani, et al., *The Dynamics of Online Hotel Prices and the EU Booking.com Case* NET Institute Working Paper No. 17-04 (2017), available at http://ssrn.com/abstract_id=3049339 [http://perma.cc/W9K9-Y546].  The leading booking site responded to the MFN ban by introducing quality improvements to the service it provided.  *See id.* at 6 tbl.1, suggesting online platform competition increased when platform MFNs were banned.

53.     As discussed herein, the Steam MFN: (a) raises prices to consumers; (b) prevents rival platforms from competing on price; (c) discourages new entry by a low-commission-charging platform; and (d) suppresses output by game developers.  Under the economics applicable to MFNs, the Steam MFN is anticompetitive.

## THE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

54.     The relevant product market is the market for sale of PC games to consumers.

55.     Alternatively, the relevant product market is the two-sided transactions market for the sale of PC games by game developers, through platforms, to consumers.

56.     Games designed to work on personal computers (e.g., desktops and laptops using a Microsoft or macOS operating system) are not compatible with and therefore do not work on game consoles (e.g., Microsoft Xbox or Sony PlayStation) or on mobile devices (e.g., iPhones or Android devices).  Accordingly, PC Games, console games, and mobile games are not substitutes for each other.

57.     The relevant geographic market for both the relevant product market and the alternative relevant product market is the United States and its territories.

58.     The MFN imposed by Valve, and agreed to by game developers, applies on a national basis.

59.     Approximately 75% of all PC games sold in the United States are sold through the Steam platform.

60.   The relevant market is highly concentrated, with only a handful of platforms and direct sales by game developers and other channels making up the additional 25% share.  Game developers do not need to use platforms to sell PC games; indeed some PC games are sold directly by game developers to consumers while others are sold by retailers such as Best Buy.  Accordingly, there are not indirect network effects in selling PC games on platforms.

61.   As discussed below, Valve has market and monopoly power in the relevant market because (a) it has a high market share; (b) it has the power to keep prices anticompetitively high; and (c) it has the power to exclude rivals.

## ALLEGATIONS

62.   Defendant Valve owns and operates Steam.  Steam is a platform for the distribution of PC Games.  The Steam platform was first released in 2003.  Since then, the Steam platform has become the dominant platform for third-party game publishing and purchasing.

63.   Through the Steam platform, Valve sells and distributes its own games, as well as third party games.

64.   Valve, through the Steam platform, has an approximate 75% market share for the sale of PC Games.  Valve generates billions of dollars each year on revenue from the Steam platform.  And, worldwide, the Steam platform has hundreds of millions of users.

65.   Game developers, seeking access to consumers such as Plaintiffs and the Class Members, market and sell their PC games on a platform.

66.   In order for game developers to sell on the Steam platform, Valve requires that game developers pay Valve a commission (which Valve terms a "revenue share") on all earnings on the Steam platform.  Before October 1, 2018, commissions for sales on Steam were 30%.  Effective as of October 1, 2018, Valve has three tiers for its commission fee: 30% on all of a game's earnings under $10 million; 25% on all of a game's earnings between $10 million and $50 million; and 20% on all of a

game's earnings over $50 million.[2]  The vast majority of sales to consumers on the Steam platform are at the 30% commission rate.

67.     Game developers overwhelmingly believe that the Steam platform does not justify a 30% Commission Fee on their earnings.[3]  But because of the Steam platform's market and monopoly power, and Valve's maintenance of that market and monopoly power via the Steam MFN, game developers have no choice but to agree to pay these commissions.

68.     Valve does not set the price to consumers, game developers do.

69.     Valve also requires game developers to enter into a confidential contract with Valve whereby the game developers agree to an MFN that requires the game developer to offer its PC games on the Steam platform at the lowest price that the PC game is offered for sale on any other third-party platform (hereinafter the "Steam MFN") or on the game developer's own website.

70.     As explained below, the Steam MFN is anticompetitive because it prevents rival platforms from competing with the Steam platform on price.  This lack of competition thereby harms consumers by keeping the prices they pay for PC games higher than they would be in a competitive market.

71.     The Steam MFN requires that a Game Developer's products cannot be sold on other platforms unless the product is also available for purchase on the Steam platform at no higher a price than is offered on any other service, website, or platform. In other words, the Steam MFN requires game developers to sell games through the Steam platform at the lowest price being offered on other platforms.

---

[2] *New Revenue Share Tiers and other updates to the Steam Distribution Agreement*, Steam, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838 (last accessed Jan. 20, 2021); *Valve now rewards successful games with a larger cut of Steam revenue*, Polygon, https://www.polygon.com/2018/12/3/18123649/valve-steam-revenue-sharing (last accessed Jan. 20, 2021).

[3]  Game Developers Conference, *State of the Game Industry 2019*, Survey_GDC19_Report-State_of_the_Game_Industry.pdf.

72.    The Steam MFN harms consumers in a variety of ways by preventing price competition, hindering innovation, and suppressing output.

**The Steam MFN Prevents Price Competition**

73.    The Steam MFN prevents price competition for PC Games.  The Steam MFN disincentives game developers from dropping the price of PC games on other platforms to take advantage of lower commissions offered by competitors to the Steam platform.

74.    Indeed, other platforms have attempted to compete with the Steam platform via lower commissions.

75.    In 2018, Epic Games opened the Epic Games Store ("EGS").  Through EGS, Epic Games sells and distributes its own games as well as third-party games. Epic Games charges a 12% commission to game developers on all earnings and is a direct competitor to the Steam platform.

76.    In an interview given shortly after EGS opened, Tim Sweeney, CEO of Epic, stated that "[f]ixed costs of developing and supporting the platform become negligible at a large scale.  In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent," and that stores could be profitable earning a 12% commission.[4]

77.    Despite the significantly lower commission structure, PC games sold on EGS sell at the same price as they are sold for on the Steam platform as required by the anticompetitive Steam MFN.

78.    Microsoft Corporation also operates a platform called the Microsoft Store ("MS").  In March 2019, Microsoft announced a 95/5 revenue split (i.e., charged a 5% commission) on PC games downloaded by a direct URL.  For all other sales, the

---

[4] *New Epic Games Store Takes on Steam With Just 12% Revenue Share*, MCV/Develop (Dec. 4, 2018) https://www.mcvuk.com/development-news/new-epic-games-store-takes-on-steam-with-just-12-revenue-share-tim-sweeney-answers-our-questions/ (last accessed Jan. 20, 2021).

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

revenue split was 85/15 (i.e., a 15% commission). In other words, if the game developer originated the sale and sent the consumer to the MS, the game developer only paid a 5% commission; if the sale originated on MS, the game developer paid a 15% commission.

79. In January 2020, Microsoft Corporation ended the 95/5 revenue share program; now, Microsoft Corporation charges game developers a 15% commission for all PC game Sales on MS.

80. Despite the significantly lower commission structure, PC games sold on MS sell at the same price as on the Steam platform as required by the anticompetitive Steam MFN.

81. Discord Inc. owned and operated the Discord store, which sold and distributed third-party games only. Around 2018, Discord began to tout itself as an alternative to the Steam platform. Notably, Discord offered game developers a 90/10 revenue split (i.e., it charged a 10% commission to game developers on all earnings), which was an aggressive strategy that curried favor with both big and small game developers. Discord was thus a direct competitor to the Steam platform.

82. In 2019, however, Discord shuttered its store. Upon information and belief, because of the Steam MFN, Discord's low-price strategy was unable to drive volume to the Discord store. Because they had agreed to the Steam MFN, game developers could not take advantage of Discord's extremely generous revenue split. In other words, the Steam MFN prevented Discord from competing for game developer sales.

83. Despite Epic Games only charging a 12% commission, and Microsoft now charging a 15% commission on all sales, the following games (for example) were selling for the identical price on Steam and at least one other platform:

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

| Game Title | Steam Price (30% Commission) | Microsoft Price (15% Commission) | Epic Price (12% Commission) |
|---|---|---|---|
| The Outer Worlds | $59.99 | $59.99 | $59.99 |
| Far Cry | $59.99 | N/S[5] | $59.99 |
| Borderlands 3 | $59.99 | N/S | $59.99 |
| Call of Duty®: Infinite Warfare | $59.99 | $59.99 | N/S |
| Remnant: From the Ashes | $39.99 | N/S | $39.99 |
| Sea of Thieves | $39.99 | $39.99 | N/S |
| Gears 5 | $39.99 | $39.99 | N/S |
| Surviving Mars | $29.99 | $29.99 | $29.99 |
| Amnesia: Rebirth | $29.99 | N/S | $29.99 |
| Oxygen Not Included | $24.99 | N/S | $24.99 |
| Tom Clancy's Rainbow Six Siege | $19.99 | N/S | $19.99 |
| The Red Strings Club | $14.99 | $14.99 | N/S |
| Halo 3 | $9.99 | $9.99 | N/S |

---

[5] The written abbreviation "N/S" indicates that the game is "Not for Sale" on a particular platform.

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

84.     Game developers are not independently choosing to price PC games at the same level across platforms; they are required to do so because of their agreement to the Steam MFN.

85.     Without the Steam MFN, it would be in game developers' independent economic interest to offer their PC games at lower prices on platforms that charge a lower commission than the Steam platform because they could generate the same or even greater revenue per game as a result of the lower commissions, while lowering prices to consumers.  Because of the Steam MFN, game developers must account for the Steam platform's supracompetitive commissions and cannot and do not lower prices on rival platforms.

86.     The following chart illustrates how the Steam MFN prevents price competition:

|  | **Steam** | **Rival Platform** |
|---|---|---|
| Commission % | 30% | 12% |
| Sale $ to Consumer | $10.00 | $10.00 |
| Developer Income | $7.00 | $8.80 |

87.     In other words, the Steam MFN prevents rival platforms from increasing volume on their platforms by offering lower commission fees—because the PC game must be priced at the same level to consumers regardless of the commission the game developer pays, game developers cannot take advantage of the lower commission levels on other platforms.  The Steam MFN thus prevents inter-platform competition.

88.     The following chart shows how, in a world without the Steam MFN, game developers could earn higher profit at lower commissions, while increasing sales and benefitting consumers:

|  | **Steam** | **Rival Platform** |
|---|---|---|
| Commission % | 30% | 12% |
| Sale $ to Consumer | $10.00 | $8.00 |
| Developer Income | $7.00 | $7.04 |

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

89.   Thus, at a 12% commission, a game developer could lower its price by 20% and still earn more profit.  And, of course, consumers would benefit by lower prices.

90.   Indeed, in a January 30, 2019 tweet, Tim Sweeney, CEO of Epic, complained about how the Steam MFN prevents price competition stating that "Steam has veto power over prices," preventing "multi-store [game] developer[s from] sell[ing] their game[s] for a lower price on the Epic Games store . . . ."  And three days later, also on Twitter, Mr. Sweeney discussed that "the only way for creators to pass savings on to gamers [because of the Steam MFN] is by avoiding the dominant store [e.g., the Steam platform]."[6]

91.   Finally, on January 11, 2020, Mr. Sweeney tweeted about how price competition would work in a competitive market: "If the 88%/12% store wars were a coin toss, here's it goes: Heads, other stores don't respond, so Epic Games Store wins and all developers win.  Tails, competitors match us, we lose our revenue sharing advantage, and maybe other stores win, but all developers still win."[7]

92.   In a competitive market unfettered by the Steam MFN, as platforms compete for game developers via lower commissions, the Steam platform would have to either lower its commissions or otherwise increase the value of its platform to consumers.  The Steam MFN saves the Steam platform from competing on the merits with other platforms.

**The Steam MFN Hinders Innovation**

93.   The Steam MFN also hinders innovation by creating an artificial barrier to entry for platforms.  When a market, such as this one, is highly concentrated, a new

---

[6] @TimSweeneyEpic, TWITTER (Jan. 30, 2019, 12:29 PM), https://twitter.com/TimSweeneyEpic/status/1090663312814157824; @TimSweeneyEpic, TWITTER (Feb. 2, 2019, 12:30 PM), https://twitter.com/TimSweeneyEpic/status/1091750761392979968
[7] @TimSweeneyEpic, TWITTER (Jan. 11, 2020, 3:07 PM) https://twitter.com/TimSweeneyEpic/status/1216089159946948620

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

entrant can benefit consumers by undercutting the incumbent's prices. The ability to provide PC games to consumers at lower prices is one way a firm or new entrant could gain market share. If this market functioned properly—that is, if the Steam MFN did not exist and platforms were able to compete on price—platforms competing with Steam would be able to provide the same (or higher) margins to game developers while simultaneously providing lower prices to consumers.

94.     As discussed above, Discord entered the market in 2018 charging a 10% commission—a commission that was two-thirds less than Steam's. Discord quickly left the market, upon information and belief, because of the anticompetitive effect of the Steam MFN. Despite Discord's low commission, game developers had to price their games at the same level as they did on the Steam platform. Accordingly, Discord, as a new market entrant with a low-cost solution, was unable to gain critical mass among consumers because game developers were unable to take advantage of Discord's lower cost structure.

**The Steam MFN Suppresses Output**

95.     Finally, the Steam MFN suppresses output—it is a basic tenet of economics that lower prices lead to increased sales. Accordingly, because of the Steam MFN's effect on prices, fewer PC games are sold (both in volume and in titles) than would be sold in a competitive market.

96.     The Discord example also illustrates this point. Without the Steam MFN, Discord's competitive pricing would have enticed game developers to price PC games at a lower level than they did on the Steam platform, because game developers would have been able to preserve their margins while selling more games. Absent the Steam MFN, a game developer that sold a game for $10 on the Steam platform could have sold the same game for $7.78 on the Discord platform and made the same $7 in gross profit. The lower price, economic theory holds, would have increased demand for that game, thereby increasing the volume of sales.

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

97.   In a world without the Steam MFN, game developers would sell more PC games at the same level of profit, consumers would spend less money per PC Game, and consumers would purchase more PC Games.  The Steam MFN thus harms consumers.

### CLASS ACTION ALLEGATIONS

98.   Plaintiffs seek to represent two classes and two sub-classes (the "Class Members") under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) for violations of 15 U.S.C. §§ 1 & 2.

(a)   The first class, "Class I," seeks damages for violations of 15 U.S.C. §§ 1 & 2 and is defined as:

All persons that have purchased PC games in the United States and its territories at any time from and after four years before the filing of this lawsuit.  This Class does not include the named Defendants, their directors, officers, or members of their families, or the United States Government.

(b)   The Parent Purchaser Sub-Class of Class I is defined as:

All parents/guardians who (a) are not Steam platform users, and thus have not agreed to the Steam Subscriber Agreement, and (b) have purchased PC games in the United States and its territories for their minor children/dependents at any time from and after four years before the filing of this lawsuit.  This Class does not include the named Defendants, their directors, officers, or members of their families, or the United States Government.

(c)   The second class, "Class II," seeks declaratory and injunctive relief for violations of 15 U.S.C. §§ 1 & 2 and is defined as:

All persons that are currently purchasing PC games in the United States and its territories at any time from and after four years before the filing of this lawsuit. This Class does not include the named Defendants, their

-19-

directors, officers, or members of their families, or the United States Government.

(d) The Parent Purchaser Sub-Class of Class II is defined as:

All parents/guardians who (a) are not Steam platform users, and thus have not agreed to the Steam Subscriber Agreement, and (b) are currently purchasing PC games in the United States and its territories for their minor children/dependents at any time from and after four years before the filing of this lawsuit. This Class does not include the named Defendants, their directors, officers, or members of their families, or the United States Government.

99. Plaintiffs Sean Colvin, Everett Stephens, and Ryan Lally bring this action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and all others similarly situated. These Plaintiffs are members of the Classes, their claims are typical of the claims of the other Class Members, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs are represented by counsel whom are competent and experienced in the litigation of class-action and antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class Members.

100. Plaintiffs Susann Davis and Hope Marchionda bring this action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and all others similarly situated. These Plaintiffs are members of the Parent Purchaser Sub-Classes, their claims are typical of the claims of the other Parent Purchaser Sub-Class Members, and Plaintiffs will fairly and adequately protect the interests of the Parent Purchaser Sub-Classes. Plaintiffs are represented by counsel whom are competent and experienced in the litigation of class-action and antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class Members in both the Class and the Parent Purchaser Sub-Class.

-20-

101.   The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to continue to impose, a common antitrust injury on the Class Members.

102.   The Class Members number in the tens of millions and are thus so numerous that joinder of all members is impracticable.

103.   The identity of all Class Members is known by the Defendants. Defendants can identify the Class Members via their internal records, including, but not limited to, their financial, membership, and purchase history records.

104.   Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform.  Common questions of law and fact will predominate over any individual questions of law and fact.  Defendants have acted and continue to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Class Members as a whole.

105.   There will be no extraordinary difficulty in the management of this Class Action.  Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual class members. Among the questions of law and fact common to Class members are the following:

(a)   Monopolization issues:

1.   Whether Valve's Steam platform has market power in the relevant product and geographic markets;

2.   Whether Valve has unlawfully monopolized, or attempted to monopolize, the market for sale of PC games to consumers, including by way of contractual terms, policies, practices, mandates, and restraints described herein in the United States and its territories;

3.   Whether competition in the market for sale of PC games to consumers has been restrained and harmed by Valve's monopolization, or attempted monopolization;

-21-

4.    Whether consumers and Class members have been damaged by Defendant's conduct;

5.    The amount of any damages; and

6.    The nature and scope of injunctive relief necessary to restore a competitive market.

(b)    Agreement issues:

1.    Whether the game developer Defendants agreed to the Steam MFN;

2.    Whether Valve and the game developer Defendants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing under the Steam MFN that the game developer Defendants would not sell their PC game products through competing platforms at a price lower than what they offered through Valve's Steam platform;

3.    Whether Valve and the game developer Defendants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing under the Steam MFN that the game developer Defendants would be penalized if they offered their PC game products through competing platforms at a price lower than what they offered through Valve's Steam platform;

4.    Whether competition in the market for sale of PC games to consumers has been restrained and harmed by Valve and the game developer Defendants' contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act;

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

5.     Whether consumers and Class members have been damaged by Defendants' conduct;

6.     The amount of any damages; and

7.     The nature and scope of injunctive relief necessary to restore a competitive market.

106.   These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual class members.

107.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

108.   This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impracticable for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## CLAIMS FOR RELIEF

### Count 1: Violation of Section 2 of the Sherman Act by Valve

109.   Plaintiffs incorporate by reference the allegations contained herein as if fully rewritten in this paragraph.

110.   Valve, utilizing the Steam platform, has monopolized the relevant market and is using the Steam MFN to maintain its monopoly.

111.   Valve has monopoly power in the relevant market.

112.   The combination of its market share and the Steam MFN allow Valve to price commissions to game developers (and thus the ultimate sale price to consumers) in an anticompetitive matter.

113.   The Steam MFN keeps Valve's commission revenue from falling.

114.   The facts that Microsoft charges a 15% commission, Epic charges a 12% commission, and Discord charged a 10% commission show that Valve is a monopolist. In other words, Valve's commissions, and thus consumer prices, are substantially above the competitive level.

115.   In a world without the Steam MFN, platform commissions (and thus consumer prices) may be even lower than the lower commissions charged by rival platforms in the actual world, as competitive forces would push platforms to price their commissions based on their costs and in reaction to how their competition is acting.

116.   The ability of Valve to require game developers to agree to the Steam MFN demonstrates its monopolization of the market.

117.   Valve maintains its monopoly by engaging in exclusionary and anticompetitive conduct.

118.   As discussed herein, the Steam MFN prevents commission competition, which would lower both the Steam platform's market share and Valve's profits.  This conduct both excludes rival platforms—both those in existence and potential new market entrants—and is by its very nature anticompetitive.   In a world where platforms competed on commissions—a world without the Steam MFN—consumer prices would be lower and output would be higher.

119.   By imposition of the Steam MFN, Valve has amassed and/or maintained monopoly power and is actually using that power to hinder competition.

120.   Valve's conduct is designed to (a) monopolize the market, and (b) maintain its monopoly in the market.  Accordingly, Valve has violated Section 2 of the Sherman Act.

121.   Every day the Steam MFN remains in effect, Valve will continue to violate Section 2 of the Sherman Act.

### Count 2: Violation of Section 1 of the Sherman Act by
### Valve and the Game Developer Defendants

122.   Plaintiffs incorporate by reference the allegations contained herein as if fully rewritten in this paragraph.

123.   The game developer Defendants enter into contracts with Valve agreeing to the Steam MFN.

124.   The Steam MFN, as discussed herein, is anticompetitive.  It has the effect of game developers charging consumers more than the game developers would in a competitive market.

125.   Valve and the game developers, by entering into agreements that restrain trade and cause increased consumer prices, have violated Section 1 of the Sherman Act.

126.   Every day the Steam MFN remains in effect, Valve and the game developers will continue to violate Section 1 of the Sherman Act.

### PRAYER FOR RELIEF

127.   WHEREFORE, Plaintiffs, on behalf of themselves and the Classes and Subclasses, pray for relief and judgment as follows:

(a)   Judgment in favor of each Plaintiff and each Class Member against each Defendant in an amount to be determined at trial including, but not limited to, compensatory damages for past and future injury, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

(b)   A declaration that the Steam MFN is anticompetitive and constitutes illegal monopolization and monopoly maintenance in violation of Section 2 of the Sherman Act;

(c)   A declaration that the Steam MFN is anticompetitive and constitutes an illegal contract in restraint of trade in violation of Section 1 of the Sherman Act;

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

    (d)    Permanent injunctive and equitable relief sufficient to eliminate the anticompetitive effects of each Defendant's actions, including but not limited to:

        1.    Enjoining the Steam MFN;

        2.    Enjoining the Defendants from instituting or agreeing to any new anticompetitive provision that would have the effect of suppressing price competition in the market;

        3.    Requiring Defendants to take affirmative action to facilitate competition in the market, including pricing to consumers based on various platforms' commission structures;

    (e)    An award of the cost of the suit, including reasonable attorney's fees; and

    (f)    Such other and further relief as this court deems just, equitable, and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1, Plaintiffs demand a trial by jury of all issues so triable.

VORYS, SATER, SEYMOUR AND PEASE LLP


*/s/ Thomas N. McCormick*
Thomas N. McCormick (CA: 325537)
52 East Gay Street, P.O. Box 1008
Columbus, OH 43216-1008
(614) 464-6433 / Fax: (614) 719-6350
tnmccormick@vorys.com

*Attorneys for Plaintiffs and Putative Class*

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

*Of Counsel / To Seek Admission Pro Hac Vice*
Kenneth J. Rubin (Ohio: 0077819)
Timothy B. McGranor (Ohio: 0072365)
Douglas R. Matthews (Ohio: 0039431)
Kara M. Mundy (Ohio: 0091146)
Danielle S. Rice (Ohio: 0093757)
52 East Gay Street, P.O. Box 1008
Columbus, OH 43216-1008
(614) 464-6400 / Fax: (614) 719-6350
kjrubin@vorys.com
tbmcgranor@vorys.com
drmatthews@vorys.com
kmmundy@vorys.com
dsrice@vorys.com

Jabari A. Shaw (Ohio: 0095940)
301 East Fourth Street
Suite 3500
Great American Tower
Cincinnati, OH 45202
(513) 723-4000 / Fax: (513) 723-4056
jashaw@vorys.com

**CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**